O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| BELLAGIO JEWELRY, INC., a California Corporation, and NUR AHMAD, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> CROTON WATCH COMPANY, INC., a New York corporation, and DOES 1 through 10, inclusive, <br><br> Defendants. <br> _____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. CV 06-6672 ODW (RZx)

STATEMENT OF DECISION FOLLOWING BENCH TRIAL

I.     INTRODUCTION

On October 19, 2006, Plaintiffs Bellagio Jewelry, Inc. and Nur Ahmad ("Plaintiffs") filed this action for trademark infringement against Defendant Croton Watch Company, Inc. ("Defendant" or "Croton"). Plaintiffs' Complaint alleges that Croton used the "Bellagio" mark in connection with a marketing campaign for a particular series of Croton watches sold on ShopNBC. Commencing May 13, 2008 and concluding May 22, 2008, this Court held a six-day bench trial to determine the merits of Plaintiffs' claims. During the trial, the Court heard witnesses from both sides, considered attorneys' arguments, reviewed deposition testimony, and sifted through several hundred trial exhibits. After the conclusion of the courtroom portion of the trial, the parties submitted separate written trial briefs, which acted as the parties' closing arguments. After considering the evidence presented at trial, the case

1   file, and the written post-trial submissions, the Court finds in Plaintiffs' favor in the amount

2   of $317,146 plus costs and attorneys fees in an amount yet to be determined, for the reasons

3   discussed below.

4   II.    FACTUAL BACKGROUND

5          Plaintiff Nur Ahmad ("Ahmad") started a jewelry and watch business in the 1980s.

6   Ahmad initially conducted business under the name Gems & Jewelry, Inc.  He then changed

7   the business name to "Bellagio Jewelry" after he took a trip to Italy and was inspired by

8   Lake Como and the picturesque town of Bellagio.  On April 10, 1992, Ahmad applied to

9   register the name "Bellagio" with the United States Patent and Trademark Office

10  ("USPTO").  On January 5, 1993, the USPTO issued the Bellagio® trademark to Ahmad as

11  it relates to jewelry and watches (International Class 14: Registration No. 1,744,449).

12         Since 1999, Bellagio Jewelry's showroom has been a small store front located in the

13  fashion district of Los Angeles.  The word "Bellagio" is displayed on the building in large

14  block lettering above the front entrance of the store.  There are also Bellagio signs located

15  inside the store.  Bellagio Jewelry's total sales range from approximately $500,000 to $1.2

16  million per year, with watches making up approximately 15% of those sales.  Bellagio

17  Jewelry's customers are typically wholesalers, small boutique owners and at large trade

18  shows.  Bellagio Jewelry also attributes a large portion of its business to walk-in customers.

19  All in all, watch sales were modest and record keeping somewhat lax.  There was testimony

20  that only one customer required purchase orders.  Nonetheless, Plaintiffs assert that they

21  have continuously used the Bellagio trademark on watches in commerce since at least 1990.

22         Defendant Croton is a well-known, New Jersey-based watch company that earns

23  approximately $20 million in annual sales.  On October 17, 2001, ShopNBC, a television

24  shopping network, began selling Croton's cubic zirconia (Cz) watches under the moniker

25  "Bellagio" or the Bellagio series of watches.  Croton's owner and president David

26  Mermelstein ("Mermelstein") was the primary sales force behind Croton's Bellagio watches

27  as he frequently guest hosted ShopNBC's on-air segments that featured Croton's Cz

28

1   watches.  Between October 17, 2001 and mid-2007, Mermelstein and ShopNBC marketed

2   and sold Croton Bellagio Watches Series 1 through 12, while 12 was arguably referred to

3   as the "G-12" or "the last of the Bellagio series"  rather than a Bellagio.  Each Croton

4   Bellagio watch sold for between $400 and $600.

5          In early 2005, before Plaintiffs knew about Croton's use of the Bellagio mark on

6   ShopNBC, Plaintiff Ahmad was approached at a Las Vegas trade show by a licensing

7   consultant, Joan Hansen, who expressed an interest in helping to license the Bellagio mark.

8   Hansen targeted Avalon Watch Corporation[1] as a potential licensee.  On August 29, 2005,

9   Bellagio Jewelry entered into a licensing agreement with Avalon whereby Avalon would

10  be granted exclusive rights to the Bellagio mark.  The agreement had an initial term of just

11  over two years, followed by four, two-year renewal options.  Avalon agreed to pay royalties

12  of 7% on sales of licensed products, with certain guaranteed minimum royalties.

13         After Avalon acquired the rights to the Bellagio mark, it began negotiating with

14  ShopNBC.  ShopNBC expressed an interest in Avalon's Bellagio line of watches and

15  requested samples.  Avalon's Bellagio watches, which it had been selling through many

16  retail shopping outlets and the Internet, ranged in price from a couple hundred dollars to

17  over $4,000.  Avalon sent watch samples to ShopNBC in approximately December 2006.

18         In July or August 2006, Jules Robbins of Avalon first discovered that Defendant

19  Croton was selling its own line of Bellagio watches on ShopNBC.  This was the first Avalon

20  had heard of any other Bellagio watch being sold by Defendant.  Jules Robbins is an

21  acquaintance of Croton's David Mermelstein, thus, after discovering Croton's use of the

22  Bellagio mark, he contacted Mermelstein about the infringing conduct.  Mermelstein

23  responded by stating he would "think about it," explaining that the name was initially

24  recommended by a ShopNBC host.

25         On August 30, 2006, Ahmad's attorneys sent a "cease and desist" letter to Croton.

26  _____

27         [1]  Avalon Watch Corporation and Webster Watch Company are closely related companies, owned
    by the same family group.  The Court will refer to these companies collectively as "Avalon."

28

1   That letter,[2] introduced at trial as Exhibit 40, contained sufficient information for Croton to

2   verify the principle claim made in the letter, *i.e.* that "Bellagio" was registered for use on

3   "jewelry and watches, in class 14." In addition to the letter stating that "Bellagio" was a

4   registered mark, a cursory look at the USPTO website would have confirmed that the

5   Bellagio mark was owned by Nur Ahmad and was first used in commerce March 31, 1990.

6   Further, it is undisputed that Plaintiffs had duly registered the mark for the use on

7   jewelry and watches and that the registration predated Defendant's use of the mark on the

8   air to market its watches. There was also no disagreement between the parties that Croton

9   was selling its watches on television by referring to them as Bellagio Generation 1 through

10  11. The word "Bellagio" was repeatedly mentioned on the air and was on the screen

11  throughout the program segments devoted to this series of watches, was referred to on

12  ShopNBC's website as well as in print ads prepared on behalf of Defendant.

13  That being said, even after Plaintiffs filed their Complaint on October 19, 2006,

14  Mermelstein went on ShopNBC to sell and promote the Croton Bellagio Generation 11 on

15  October 29, 2006. Mermelstein announced during the show that after the Bellagio 11, he

16  would be selling one more generation of the Bellagio watch, which would be the last of the

17  series, but he stated: "There's going to be a different name on that."

18  Later, in the spring of 2007, ShopNBC and Croton introduced the final Croton

19  Bellagio series watch. This watch was referred to as the "G-12" or "Generation 12" rather

20  than the "Bellagio 12." During one of the ShopNBC shows to sell the G-12, a ShopNBC

21  host stated: "I wonder why this isn't a part of the Bellagio series. I would think this would

22  be a contender to be part of the Bellagio series." In a separate show in March 2007,

23  Mermelstein himself described the G-12 as the last of the Bellagio series although he later

24

25

26  _____

27       [2]   Mr. Mermelstein testified that he turned the letter over to his attorney Max Moskowitz of the

28  New York law firm of Ostrolenk Faber Gerb & Soffen, LLP.

1  testified that this reference was a "slip of the tongue."[3]

2  As of July 27, 2007, Croton's website still displayed a back edition of *Croton*
3  *Chronicle* featuring information about the G-12.  And, as of August 27, 2007, Croton's
4  website continued to display promotional material for the Croton Bellagio Generation 11.

5  In May 2007, Avalon continued to pursue a partnership to sell its Avalon Bellagio
6  watches on ShopNBC.  ShopNBC featured Avalon's Bellagio watch as a "Host Pick," put
7  the Avalon Bellagio watch on the cover of ShopNBC's Program Guide, and sent out a flyer
8  regarding the Avalon Bellagio watch to ShopNBC customers.  During the "Host Pick"
9  segment, the Avalon Bellagio ceramic watch was tested to see its potential, and, after six
10  and a half minutes, 39 watches sold at approximately $1,800 per watch.  ShopNBC liked
11  the potential of Avalon's Bellagio watch and reached a verbal agreement with Avalon,
12  giving ShopNBC exclusive rights to sell the Bellagio Ceramica.

13  In anticipation of future sales on ShopNBC, Avalon ordered significant quantities of
14  inventory.  Because of apparent pressure placed on ShopNBC by Mermelstein, however,
15  Avalon was never allowed to sell watches on ShopNBC.  ShopNBC was Croton's biggest
16  customer and Croton had a longstanding relationship with ShopNBC.  Therefore, because
17  it apparently did not want to tarnish its business relationship with Croton, ShopNBC
18  relinquished its deal with Avalon.  In fact, at one point, Avalon's Linda Robbins received
19  a phone call from Croton's attorneys demanding that she have Ahmad terminate his lawsuit,
20  threatening that if the action was not dismissed, Avalon would never do business with
21  ShopNBC.  ShopNBC took the position that Avalon would not be allowed to appear on
22  television unless Plaintiffs dismissed their lawsuit.

23  Because of Avalon's inability to work with ShopNBC, the real purpose of the

24

---

25      [3]   It warrants noting that observing both David and Eli Mermelstein while testifying, the Court
26  found them to be less than credible.  David Mermelstein was repeatedly impeached with his prior
    testimony, and other parts of his testimony were patently disingenuous.  Eli Mermelstein was clearly less
27  affable than he was while testifying in his videotaped depositions.  At trial he could barely contain his
    contempt for opposing counsel, and, the Court suspects, the process itself.
28

licensing agreement was frustrated and Avalon, not surprisingly decided not to exercise its option to renew that agreement with Ahmad and Bellagio Jewelry. By its terms, the licensing agreement expired on December 31, 2007. Plaintiffs argue that they have suffered damages due lost royalties from Avalon and that they are entitled to profits attributed to Croton's use of the "Bellagio" mark.

III.    DISCUSSION

At this point the Court will examine Plaintiffs' claims and Defendant's defenses raised at trial. The Court will discuss the validity of Plaintiffs' mark, whether Defendant's infringement created a likelihood of confusion, whether Plaintiffs are entitled to damages, whether Defendant's petition to the USPTO's Trademark Trial and Appeal Board to cancel Plaintiffs' trademark should be dismissed, and, finally, whether Defendant should be liable for discovery sanctions and attorneys' fees.

### A.    THE VALIDITY OF PLAINTIFFS' "BELLAGIO" MARK

One of Croton's primary defenses is that Plaintiffs abandoned their use of the name "Bellagio," thus, invalidating Plaintiffs' rights in an otherwise protectable mark. Specifically, Croton argues that there have been three-year periods when Plaintiffs did not use the Bellagio mark in commerce as it relates to watches. Any three-year period of non-use, Croton argues, would trigger the presumption that the mark has been abandoned.

"Federal registration of a trademark 'constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark' in commerce." *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 755 (9th Cir. 2006) (quoting *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999)); *see also Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254 (9th Cir. 1982) (noting, "[f]ederal registration of a trademark endows it with a strong presumption of validity."). Even if a mark has been registered, however, a trademark is abandoned under the Lanham Act when its use in commerce is discontinued with intent not to resume use. *See* 15 U.S.C. § 1127. If the party alleging abandonment establishes a prima facie case of abandonment

6

1    by showing a three-year period of non-use, then "a rebuttable presumption of abandonment

2    is created." *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 411 (9th Cir. 1996); *Star-Kist*

3    *Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir. 1985).

4           "Since abandonment results in a forfeiture of rights, [] courts are reluctant to find an

5    abandonment." 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*,

6    § 17.12 at 17-20 (4th ed. 2008); *see also Cumulus Media, Inc. v. Clear Channel Commc'ns,*

7    *Inc.*, 304 F.3d 1167, 1175 (11th Cir.2002) ("Because a finding of abandonment works an

8    involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an

9    abandonment defense face a 'stringent,' 'heavy,' or 'strict burden of proof.'"). Thus, "the

10   party asserting abandonment, is required to 'strictly prove' its claim." *Electro Source, LLC*

11   *v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 935 (9th Cir. 2006) (quoting *Prudential*

12   *Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.2d 1150, 1156 (9th Cir. 1982)).  The

13   Ninth Circuit has noted that this "strictly prove" language is akin to the "clear and

14   convincing evidence" standard.  *See id.*; *see also Grocery Outlet Inc. v. Albertson's Inc.*,

15   497 F.3d 949, 952-53 (9th Cir. 2007) (Wallace, J., concurring) (stating, "[i]n my view,

16   meeting a strict burden requires proof by clear and convincing evidence.").

17          Here, it is undisputed that since 1993 Plaintiff Ahmad has owned a registration

18   covering the Bellagio mark as it relates to jewelry and watches.  In 1998, Ahmad filed a

19   declaration of use under Section 8 of the U.S. Trademark Act and a declaration of

20   incontestability under Section 15.  It is also undisputed that, in 2002, Ahmad filed a renewal

21   application.  Accordingly, Ahmad presumably holds a valid trademark, and has had the

22   exclusive right to use the mark in commerce since 1993.

23          Because Plaintiffs hold a presumptively valid mark, it is Croton's burden to show

24   abandonment.  As Croton aptly stated at trial, it may be difficult to present evidence of non-

25   use, because this is analogous to producing negative evidence.  Nonetheless, Croton must

26   still provide at least *some* support for its assertion that Plaintiffs abandoned their mark.  In

27   that regard, Croton was unable to establish a prima facie case of abandonment.  Thus,

28

1   Plaintiffs have no obligation or burden to rebut Croton's naked unsupported assertion of

2   abandonment.

3       Even if Croton's abandonment claim had merit, Plaintiffs rebutted the aforementioned

4   presumption by presenting evidence of continued use of its mark in commerce.  Plaintiffs'

5   evidence included receipts of sales, long-term use of the storefront featuring the name

6   "Bellagio," and testimony that Bellagio tags and labels were attached to watches sold at the

7   Bellagio Jewelry store since the mid-1990s.  In addition, Plaintiffs have shown intent to

8   continue using the mark by prosecuting alleged infringers.  Plaintiffs have sent numerous

9   cease and desist letters to other infringing companies.  For example, in 2001 Plaintiffs

10  objected to the Las Vegas, Nevada Bellagio Hotel & Casino's use of Bellagio on watches,

11  and ultimately entered into a settlement agreement with the hotel whereby the hotel agreed

12  that it would not use the Bellagio mark on watches or jewelry.  This diligence to protect its

13  trademark, shows Plaintiffs' intent not to abandon its mark.  While some of Plaintiffs'

14  exhibits showed only scarce use, the combined evidence taken as a whole shows continuous

15  use with no intent to abandon the Bellagio mark.  Therefore, Plaintiffs have a valid,

16  protectable interest in the Bellagio mark.

17      **B.    CROTON'S INFRINGEMENT: LIKELIHOOD OF CONFUSION**

18              1.    Reverse Confusion

19      Traditional "[f]orward confusion occurs when consumers believe that goods bearing

20  the junior mark came from, or were sponsored by, the senior mark holder. . . . By contrast,

21  reverse confusion occurs when consumers dealing with the senior mark holder believe that

22  they are doing business with the junior one." *Surfvivor Media, Inc. v. Survivor Prods.*, 406

23  F.3d 625, 630 (9th Cir.2005).  "Both reverse and forward confusion cases require the

24  plaintiff to demonstrate a likelihood of confusion among consumers." *M2 Software, Inc.*

25  *v. Madacy Entertainment*, 421 F.3d 1073, 1080 (9th Cir. 2005).  Additionally, reverse

26  confusion occurs "when the junior user's advertising and promotion so swamps the senior

27  user's reputation in the market that customers are likely to be confused into thinking that

28

1  the senior user's goods are those of the junior user: the reverse of traditional confusion."

2  4 J. Thomas McCarthy, *supra*, § 23:10 at 23-47.  "[T]he doctrine of reverse confusion is

3  designed to prevent the calamitous situation we have here–a larger, more powerful company

4  usurping the business identity of a smaller senior user."  *Commerce Nat. Ins. Services, Inc.*

5  *v. Commerce Ins. Agency, Inc.*, 214 F.3d 432 (3rd Cir. 2000).

6       Here, Croton swamped the marketplace with Bellagio watches, at least with regard

7  to the ShopNBC marketplace.  Over a six-year period, Croton literally reached millions of

8  consumers with its promotion and advertising of its Bellagio watches that included

9  television, Internet, and print.  Thus, Croton sufficiently meets the "swamped the

10  marketplace" test under the reverse confusion analysis.

11       Still, "[t]he ultimate question in a reverse confusion case is whether consumers doing

12  business with the senior user might mistakenly believe that they are dealing with the junior

13  user." *Playmakers LLC v. ESPN, Inc.*, 376 F.3d 894, 897 (9th Cir. 2004) (internal quotation

14  omitted).  Thus, here, the issue is whether a reasonable consumer who purchases a Bellagio

15  watch from Bellagio Jewelry (the senior user) or its licensee, Avalon, might do so believing

16  the source of the watch is Croton (the junior user).

17            2.     <u>Likelihood of Confusion as to Plaintiffs' First and Second Claims</u>

18       Plaintiffs assert infringement claims under the Lanham Act, 15 U.S.C. § 1114, and

19  related state law claims.  "A successful trademark infringement claim under the Lanham Act

20  requires a showing that the claimant holds a protectable mark, and that the alleged

21  infringer's imitating mark is similar enough to 'cause confusion, or to cause mistake, or to

22  deceive.'"  *Surfvivor*, 406 F.3d at 630 (quoting *KP Permanent Make-Up, Inc. v. Lasting*

23  *Impression I, Inc.*, 543 U.S. 111, 117 (2004) (citation omitted)).  The test for "likelihood of

24  confusion" requires the Court to determine whether a "reasonably prudent consumer in the

25  marketplace is likely to be confused as to the origin of the good or service bearing one of

26  the marks." *Id*. (quoting *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129

27  (9th Cir. 1998) (internal quotation marks omitted)).

28

In the Ninth Circuit, the following eight factor test governs the likelihood of confusion analysis: (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the mark; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and purchaser care; (7) intent; and (8) likelihood of expansion. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). "[T]his eight-factor test . . . is pliant. Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." *Brookfield Comm.,* 174 F.3d at 1054. The ultimate question of likelihood of confusion, however, "is predominantly factual in nature," as is each factor within the *Sleekcraft* test. *Wendt v. Host Intern., Inc.*, 125 F.3d 806, 812 (9th Cir. 1997).

The relevant *Sleekcraft* factors in this case establish that a likelihood of confusion exists. Each is reviewed in turn.

### i.       Strength of the "Croton" and "Bellagio" Marks

Because this is a reverse confusion case, the Court will first look at the commercial strength of the junior user's (Croton) mark. *See Dreamwerks*, 142 F.3d at 1130 n.5 (noting, "[i]n a reverse confusion case . . . [the court] must focus on the strength of the *junior* user's mark.); *see also Freedom Card, Inc. v. J P Morgan  Chase & Co.*, 432 F.3d 463, 472-73 (3rd Cir. 2005) (noting that the inquiry in "resolving reverse confusion should be the commercial impact of the stronger junior user's mark on the weaker mark of the senior but less dominant user."). Thus, the stronger or more well-known the Croton mark, "the more likely it is to capture the minds of [Plaintiffs'] customers." *Id.*; *see also Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (observing that "[r]everse confusion is the misimpression that the junior user is the source of the senior user's goods." (internal quotation marks omitted)). In addition, "[t]he strength of the junior mark is closely related to how much the market is saturated by the junior mark." *M2 Software,* 421 F.3d at 1089 (citing *Dreamwerks*, 142 F.3d at 1130 n. 5).

It is undisputed that Croton is a commercially successful mark and a well-known

brand for watches. Croton generates approximately $20 million in annual sales.  Thus, the Croton mark is commercially strong.  After several years of Croton using the name "Bellagio" to identify its watches, consumers were likely to associate "Bellagio" watches with the Croton brand.  This creates a quintessential reverse confusion scenario.  Accordingly, because the Croton mark is commercially strong, this factor tips in favor of Plaintiffs.

In addition to examining the commercial strength of the junior user's mark, it is important to exam the strength, in terms of distinctiveness, of the senior user's mark.  *See Surfvivor*, 406 F.3d at 631 n. 3 (explaining that the focus on the junior mark in a reverse confusion case "does not mean that inquiry into the strength of the senior mark is completely foregone.").  Therefore, the Court now turns to the strength of Plaintiffs' Bellagio mark.

"The scope of the trademark protection that [courts] give marks depends upon the strength of the mark, with stronger marks receiving greater protection than weak ones." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002).  "The strength of a mark is determined by its placement on a continuum of marks." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992).

Trademarks are divided into five categories.  "The two strongest sets of marks are 'arbitrary' and 'fanciful' marks, which trigger the highest degree of trademark protection." *Surfvivor,* 406 F.3d at 631.  "'Arbitrary' marks are common words that have no connection with the actual product–for example, 'Dutch Boy' paint." *Id*. at 631-32 (citing *Dreamwerks*, 142 F.3d at 1130 n.7).  "'Fanciful' marks consist of 'coined phrases' that also have no commonly known connection with the product at hand." *Id*. at 632.  Examples of fanciful marks include "Kodak" cameras or "Aveda" skin care products. *Id*. (citing *Dreamwerks*, 142 F.3d at 1130 n.7).

"'Suggestive' marks do not 'describe the product's features but suggest[] them.'" *Surfvivor*, 406 F.3d at 632 (quoting *Kendall-Jackson Winery v. E. & J. Gallo Winery*, 150

F.3d 1042, 1047 n.8 (9th Cir.1998)). Some imagination is required to associate a suggestive mark with the product. *See id*. "Examples include 'Slickcraft' boats or 'Air Care,' for a service that maintains medical equipment for administering oxygen." *Id*. (citations omitted).

The fourth category is referred to as "descriptive." *Id*. (citing *Kendall-Jackson Winery*, 150 F.3d at 1047. "These marks define a particular characteristic of the product in a way that does not require any exercise of the imagination." *Id*. (citation omitted). "An example of a descriptive mark is 'Honey Roasted' for nuts roasted with honey." *Surfvivor*, 406 F.3d at 632 (citation omitted). Because descriptive marks merely describe a characteristic of the product, "they do not receive any trademark protection unless they acquire sufficient 'secondary meaning' to create an association between the mark and the product." *Id.* (citation omitted).

"The final category of marks consists of 'generic' marks, which describe the product in its entirety, and which are not entitled to trademark protection." *Id*. (citation omitted). "Examples include 'Liquid controls' for equipment that dispenses liquid, or 'Multistate Bar Examination' for a bar examination that may be taken across multiple states." *Id*. (citations omitted).

Plaintiffs argue that the Bellagio mark is arbitrary while Defendant predictably contends the mark is merely suggestive. As Plaintiffs note, Bellagio may conjure up images of a famous hotel, or perhaps a charming Italian town nestled between two legs of Lake Como, but it does not bring to mind watches. Defendant asserts that "Bellagio" refers to or *suggests* a watch's flashy, glitzy, Las Vegas-style appearance associated with the famous Bellagio Hotel.[4] Defendant's argument is a stretch, however. While Defendant may have used the name Bellagio to suggest Las Vegas, Plaintiffs have used "Bellagio" as a mark for its watches and jewelry since before the hotel in Las Vegas was built. Thus, when

---

[4]   Defendant's argument raises the question of why Defendant was not curious from the outset as to whether its use of the Bellagio mark might be infringing on the rights of that same famous Las Vegas Hotel.

1   determining the category of a mark, the Court should not necessarily look to the purpose of

2   Defendant's infringing use, but rather, the focus should be on the way in which Plaintiffs

3   use the mark.  The Court agrees with Plaintiff; Bellagio is arbitrary as it relates to watches.

4   Therefore, Plaintiffs' mark is strong and it triggers a high degree of protection.  Overall, the

5   first factor pertaining to the strength of the parties' marks tips in favor of Plaintiffs and the

6   Court's finding of a likelihood of confusion.

7   ## ii.    Relatedness of the goods

8   When dealing with the second *Sleekcraft* factor, the Court assesses whether the goods

9   are related or complementary.  *Sleekcraft*, 599 F.2d at 350.  Where the goods are related or

10  complimentary, the danger of confusion is heightened.  *See id.* (noting that confusion may

11  be likely where goods are similar in use and function).  "Related goods are those products

12  which would be reasonably thought by the buying public to come from the same source if

13  sold under the same mark."  *Id.*  Here, it is undisputed that the goods (watches) at issue are

14  related.  Thus, the weight of this factor tips strongly in Plaintiffs' favor.

15  ## iii.   Similarity of the marks

16  Similarity of the marks "has always been considered a critical question in the

17  likelihood-of-confusion analysis."  *GoTo.com v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th

18  Cir. 2000).  "[The Ninth Circuit has] developed certain detailed axioms to guide this

19  comparison: first, the marks must be considered in their entirety and as they appear in the

20  marketplace; second, the similarity is adjudged in terms of appearance, sound, and meaning;

21  and third, similarities are weighed more heavily than differences."  *Id.* at 1206 (internal

22  citations omitted).  Here, Croton used the term "Bellagio" similar to the way in which

23  Plaintiffs used the mark.  The Bellagio mark was used to describe a watch.  However, while

24  Plaintiffs used the term "Bellagio" as a brand name on the product and packaging, Croton

25  used it only in marketing its watches.  The name "Bellagio" was not actually on Croton's

26  watches or packaging whereas the name "Croton" did appear on Croton's watches and

27  packaging.  These facts favor Croton.

28

1    Plaintiffs point out, however, that while Croton was selling the Bellagio watches on

2    ShopNBC, the word "Bellagio" appeared on the television screen as Mr. Mermelstein

3    continuously shouted "Bellagio" to sell the product.  These facts, describing Croton's use

4    of the Bellagio mark in the marketplace and the consumers' overall marketplace encounter,

5    favor Plaintiffs.

6          The appearance, sound, and meaning consideration tips in favor of Plaintiffs as well,

7    because the term "Bellagio" was spelled and pronounced the same.  The term was also used

8    to mean that a Bellagio watch is upscale and glamorous.  Thus, because similarities are

9    weighed more heavily than differences, this factor pertaining to the similarity of the marks

10   tips in favor of Plaintiffs.

11                        ***iv.***     ***Evidence of actual confusion***

12         "Evidence that use of the two marks has already led to confusion is persuasive proof

13   that future confusion is likely." *Sleekcraft*, 599 F.2d at 352.  Survey evidence or testimony

14   from actual consumers is the best way to show evidence of actual confusion.  *See Thane*

15   *Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002); *see also Clicks*

16   *Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1265 (9th Cir. 2001).  Actual confusion

17   is not necessary to establish likelihood of confusion, but is strong evidence.  *See Surfvivor*,

18   406 F.3d at 633.

19         Here, there was some evidence of actual confusion presented at trial.  Plaintiffs allege

20   that, after Avalon sold its test-run of watches on ShopNBC, one of the purchasers called

21   Avalon under the mistaken impression he was dealing with Croton.  Plaintiffs also presented

22   numerous online search results showing an association between Bellagio and Croton among

23   internet vendors and resellers.  For example, Plaintiffs' trial evidence showed that when

24   searching for "Bellagio watches" on various websites such as Yahoo! Shopping, Shopzilla,

25   ShopAtHome, Biz Rate and eBay, the searches consistently yielded as a result, "Croton

26   Bellagio" watches.  Thus, there appears to be some evidence of actual confusion.  This

27   factor tips in favor of Plaintiffs.

28

1

### v.      Marketing channels

2      "Convergent marketing channels increase the likelihood of confusion." *Nutri/System,*

3  *Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987).  Here, Plaintiffs' and

4  Defendant's goods are sold in the same or similar outlets.  Specifically, Plaintiffs sell

5  products on the Internet as does Croton.  Plaintiffs' licensee Avalon sells products on the

6  Internet and sold, or was attempting to sell, products on ShopNBC, Croton's primary

7  marketing outlet.  This factor, therefore, weighs in Plaintiffs' favor.

8

### vi.      Type of goods and degree of purchaser care

9      "In analyzing the degree of care that a consumer might exercise in purchasing the

10  parties' goods, the question is whether a 'reasonably prudent consumer' would take the time

11  to distinguish between the two product lines."  *Surfvivor*, 406 F.3d at 634 (quoting

12  *Brookfield Comm.,* 174 F.3d at 1060).  Courts have noted, [i]n a reverse confusion case, 'the

13  degree of care exercised by customers is determined with reference to the alleged senior

14  user's customers only.'"  *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290

15  F.Supp.2d 1083, 1095 (C.D. Cal. 2003) (quoting *Mach. Head v. Dewey Global Holdings,*

16  *Inc.*, 61 U.S.P.Q.2d 1313, 1318 (N.D. Cal. 2001)).

17      Here, it is clear that the type of goods sold by Plaintiffs and Defendant are the same:

18  watches.  However, Defendant argues that customers would practice a high degree of care

19  when purchasing Croton's $400 to $600 watches compared to not as much care given when

20  purchasing Plaintiffs' relatively "cheap" watches that sell for $10 to $12.  Defendant argues

21  that watch buyers would not miss the large price difference.  Even still, Mermelstein

22  testified that his target customers are "compulsive buyers."  In addition, Defendant did not

23  take into consideration Avalon's watches, which was Croton's true competitor on

24  ShopNBC.  Avalon's watches were more expensive than Croton's, leading the Court to

25  believe that Avalon's customers would practice a fairly high degree of care when

26  purchasing a watch or watches.  It would appear purchasers of expensive watches would

27  likely practice a high degree of care, yet when considering Mermelstein's comment that

28

1    Croton targets "compulsive buyers," the strength of this factor in favor of Croton is
2    diminished.

3                              *vii.    Intent*

4          A plaintiff in an infringement case need not demonstrate that the defendant "intended
5    to deceive consumers." *E. & J. Gallo Winery*, 967 F.2d at 1293.  Instead, "where the
6    alleged infringer adopted his mark with knowledge, actual or constructive, that it was
7    another's trademark," this factor should favor the plaintiff.  *Surfvivor*, 406 F.3d at 634
8    (quoting *Brookfield Comm.*, 174 F.3d at 1059).  "Registration of a mark on the principal
9    register . . . shall be constructive notice of the registrant's claim of ownership thereof."  15
10   U.S.C. § 1072.

11         Here, Defendant argues that it had no intent to infringe upon Plaintiffs' mark.  At a
12   minimum, however, Croton had constructive knowledge that someone else owned the
13   Bellagio trademark before it started using the name.  Evidence presented at trial shows that
14   Croton, prior to its use of the Bellagio mark, did not conduct a proper investigation to
15   determine whether the mark was registered.  This is all the more shocking considering the
16   famous Bellagio Hotel in Las Vegas.  One would think that, even if Croton was not aware
17   of Plaintiffs' small business in Los Angeles, Croton would nonetheless be leery of using the
18   Bellagio mark for fear that such use might infringe on the hotel's rights.  Additionally, after
19   Plaintiffs' cease and desist letter dated August 30, 2006, Croton continued to use the
20   Bellagio mark to market its watches.  While there is no evidence that Croton maliciously
21   intended to deceive consumers, this factor still tips in favor of Plaintiffs.

22                       *viii.    Likelihood of expansion*

23         With regard to this factor, the Court must determine whether Croton's infringing
24   activity hindered or is hindering Plaintiffs' expansion plans.  *Surfvivor*, 406 F.3d at 634.
25   (citing *Entrepreneur Media*, 279 F.3d at 1152).  Plaintiffs evidence demonstrates that
26   Bellagio Jewelry was attempting to expand through its licensing agreement with Avalon,
27   and ShopNBC was the primary target for Avalon's marketing efforts.  Evidence at trial

28

1   established that Croton's use of the Bellagio mark on ShopNBC prevented Avalon's attempt
2   to gain access to ShopNBC and thereby thwarted Plaintiffs' and Avalon's expansion efforts.
3   This factor weighs heavily in favor of Plaintiffs.

4                    ix.      *Overall Analysis of the Sleekcraft Factors*

5          In the end, the distribution of the *Sleekcraft* factors strongly favors a finding that
6   Croton's infringing activity created a likelihood of confusion.  Accordingly, the Court finds
7   that a likelihood of confusion exists.  The evidence proving infringement under 15 U.S.C.
8   1114(a) also establishes Crotons liability for false designation of origin under 15 U.S.C.
9   1125(a).  Accordingly, Plaintiffs prevail on their First and Second Claims for Relief.

10                 3.      Unfair Competition Under Federal and State Statutes

11         Plaintiffs have claimed unfair competition under 15 U.S.C. § 1125(a) and California
12  Business and Professions Code § 17200.  The Ninth Circuit "has consistently held that state
13  common law claims of unfair competition and actions pursuant to California Business and
14  Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham
15  Act."  *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) (citing *Academy of*
16  *Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457
17  (9th Cir. 1991)); *see also Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th
18  Cir. 1988) (holding that under both statutes the "ultimate test" is "whether the public is
19  likely to be deceived or confused by the similarity of the marks." (internal quotations
20  omitted)); *Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F.Supp. 1346, 1362 (C.D. Cal. 1984)
21  (concluding that misappropriation deemed "unfair" under the Lanham Act is also
22  "wrongful" and proscribed under § 17200.).   Therefore, because the Court finds
23  infringement under the Lanham Act, Croton is also liable for unfair competition under 15
24  U.S.C. § 1125(a) and California Business and Professions Code § 17200.

25
26
27
28

1

## C.   DAMAGES

2       Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), governs the award of monetary

3   remedies in trademark infringement cases and, subject to the principles of equity, provides

4   for an award of the defendant's profits, any damages sustained by the plaintiff, and the costs

5   of the action.[5]  Defendant argues that, in order to avoid double recovery, Plaintiffs must

6   elect only one of the three forms of recover under § 1117(a).  The Court feels the language

7   of the statute speaks for itself, however.  Plaintiffs can recover Defendant's profits, any

8   damages sustained, *and* the costs of the action.  *See* 15 U.S.C. § 1117(a).

9       The "election clause" Defendant references pertains to statutory damages under §

10  1117(c). Here, Plaintiffs are not seeking statutory damages under § 1117(c), but are seeking

11  actual damages and profits under § 1117(a).  In addition, the Court feels that awarding lost

12  royalties as actual damages and a portion of Defendant's profits for willful infringement

13  here does not amount to double recovery, because the Court is not using Defendant's profits

14  as a measure of Plaintiffs' actual damages.  Therefore, an award of both lost royalties and

15

16

17

18       [5]  15 U.S.C. § 1117(a) provides,

19
20       When a violation of any right of the registrant of a mark registered in the Patent and
         Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful
21       violation under section 1125(c) of this title . . . the plaintiff shall be entitled, subject to the
         provisions of sections 1111 and 1114 of this title, and subject to the principles of equity,
22       to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the
         costs of the action.  The court shall assess such profits and damages or cause the same to
23       be assessed under its direction.  In assessing profits the plaintiff shall be required to prove
         defendant's sales only; defendant must prove all elements of cost or deduction claimed.
24       In assessing damages the court may enter judgment, according to the circumstances of the
         case, for any sum above the amount found as actual damages, not exceeding three times
25       such amount.  If the court shall find that the amount of the recovery based on profits is
         either inadequate or excessive the court may in its discretion enter judgment for such sum
26       as the court shall find to be just, according to the circumstances of the case.  Such sum in
         either of the above circumstances shall constitute compensation and not a penalty.  The
27       court in exceptional cases may award reasonable attorney fees to the prevailing party.

28

1  defendant's profits may be proper in this case.[6]

2                  1.   <u>Lost Royalties</u>

3         Plaintiffs seek $238,833 in lost royalty income.  This amount is justified as damages

4  incurred by Plaintiffs.  Croton's infringing use of Plaintiffs' trademark led to Avalon's

5  failure to gain access to ShopNBC in the fall of 2007.  This in turn caused Avalon not to

6  renew its licensing agreement with Plaintiffs.  Stated differently, but for Croton's

7  infringement and control over ShopNBC, Avalon would have renewed its licensing

8  agreement with Plaintiffs.  At trial Plaintiffs proved actual damages in the amount of

9  $238,833.  Plaintiffs' financial expert, Dr. Jubin Merati, testified that this sum is equal to

10  two years of guaranteed minimum royalty payments discounted to present value.  Plaintiffs

11  would have received such royalties had Avalon renewed its license for one term.  The Court

12  agrees with Plaintiffs in that their requested dollar amount is conservative and thereby

13  reasonable.  Accordingly, the Court awards Plaintiffs $238,833 in actual damages suffered

14  due to lost royalties they would have received from Avalon but for Croton's infringement.

15                  2.   <u>Accounting of Profits</u>

16         Plaintiffs seek to recover Defendant's profits from its sales of Bellagio watches.  "The

17  Supreme Court has indicated that an accounting of profits follows as a matter of course after

18  infringement is found by a competitor."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400,

19  1405 (9th Cir. 1993), *cert. denied*, 510 U.S. 815 (1993) (citing *Hamilton-Brown Shoe Co.*

20  *v. Wolf Bros. & Co.*, 240 U.S. 251, 259 (1916)).  Nonetheless, "an accounting of profits is

21  not automatic and must be granted in light of equitable considerations."  *Id*. (citing

22  *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 131 (1947)).

23         Generally, a plaintiff must establish that the defendant engaged in willful misconduct

24

25        [6]  The Court is also mindful of the fact that monetary awards under the Lanham Act are to be

26  guided by "the principles of equity."  *See* 15 U.S.C. § 1117(a).  And, as the Ninth Circuit has stressed, "the trial court's primary function should center on making any violations of the Lanham Act unprofitable

27  to the infringing party."  *Playboy Enter., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1274 (9th Cir.1982) (citing *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117 (9th Cir. 1968)).

28

1   to obtain a defendant's profits. *Id.* at 1405-06. However, the Ninth Circuit has suggested

2   that willfulness is not always a prerequisite to an award of a defendant's profits in a

3   trademark infringement action. *See e.g.*, *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th

4   Cir.1995) ("An instruction that willful infringement is a prerequisite to an award of

5   defendant's profits may be error in some circumstances (as when plaintiff seeks the

6   defendant's profits as a measure of his own damage . . .).") (internal citation omitted).

7   Therefore, as case law and section 1117(a) suggest, a defendant's profits are recoverable in

8   two situations: (1) when the parties are competitors and the plaintiff seeks the defendant's

9   profits as a measure of the plaintiff's own damages or (2) when trademark infringement is

10  "willfully calculated to exploit the advantage of an established mark." *See Lindy Pen Co.*,

11  982 F.2d at 1405, 1407-08; *Playboy*, 692 F.2d at 1274.

12      To simplify the above rule, it appears that when courts look to 15 U.S.C. § 1117(a)(1)

13  dealing with "defendant's profits," willful infringement is required. But when awarding

14  damages under § 1117(a)(2) pertaining to "any damages sustained by the plaintiff,"

15  willfulness is not required. If damages are sought under § 1117(a)(2), the Ninth Circuit has

16  noted, "[d]amages are typically measured by any direct injury which a plaintiff can prove,

17  as well as any lost profits which the plaintiff would have earned but for the infringement."

18  *Lindy Pen Co.*, 982 F.2d at 1405 (citations omitted). The important distinction is that, when

19  a willful infringement is not present, a plaintiff may seek a defendant's profits as a measure

20  of compensatory damages, but not to punish the defendant (i.e. punitive damages). *See*

21  *Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1346-53 (7th Cir. 1994) ("*Sands*

22  *II*") (offering a learned and well-reasoned analysis of compensatory versus punitive

23  damages within the meaning of § 1117(a)).

24      Here, the Court is dealing with a reverse confusion case. And, as the Seventh Circuit

25  has noted, willful "intent is necessarily absent in a reverse confusion case." *Sands, Taylor*

26  *& Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 961 (7th Cir. 1992) ("*Sands I*"). The Court

27  has determined that Plaintiffs' actual damages under § 1117(a)(2) consist only of lost

28

1    royalties.  Therefore, Plaintiffs must show willful infringement to recover Defendant's

2    profits under § 1117(a)(1).

3        Plaintiffs seek $1,062,409, which is calculated by taking Defendant's profits from

4    selling the Bellagio series of watches on ShopNBC less Defendant's overhead costs and

5    expenses.  The majority of this amount was accrued, however, when Croton was not

6    willfully infringing upon the Bellagio mark.  Thus, the majority of Defendant's profits are

7    not recoverable.  Nonetheless, the Court finds that a portion of Defendant's profits can be

8    attributed to watch sales made after Plaintiffs sent Croton the cease and desist letter.  After

9    receiving the cease and desist letter, Croton was put on actual notice, which logically

10   demonstrates that any infringing conduct thereafter was done willfully.

11       It is clear that Croton's Bellagio series 11 was sold after the cease and desist letter

12   was received.  Plaintiffs also argue that the Bellagio 12 or G-12 was a continuation of

13   Croton's infringing conduct, because the G-12 was initially marketed as the "last of the

14   Bellagio series."  The Court agrees that it is difficult to separate the G-12 from the earlier

15   watches sold in the Bellagio series.  The initial marketing of the G-12 mentioned the name

16   "Bellagio" and consumers knew to expect another Bellagio-like watch when the G-12 was

17   released.  Accordingly, the Court disgorges Croton's profits in the amount of $78,313

18   obtained from sales of the G-12 as well as the Bellagio 11 watches.[7]

19       In sum, Plaintiffs suffered actual damages under § 1117(a)(2) in the form of lost

20   royalties in the amount of $238,833.  Plaintiffs are also entitled to recover $78,313 of

21   Croton's profits pursuant to § 1117(a)(1) for Defendant's willful infringement as to the

22   Bellagio 11 and G-12 watches.  Accordingly, Plaintiffs are entitled to a total damages

23   recovery of $317,146.

24

25       [7]  The amount of $78,313 was calculated from exhibits produced at trial.  Plaintiffs evaluated
26   invoices and purchase orders and subtracted Croton's costs to ascertain the amount of profits.  (*See* Trial
     Exhibit 363.) The trial exhibits reveal $38,013 as Croton's profits from the Bellagio 11.  Croton produced
27   only a portion of its G-12 invoices, thus, Plaintiffs' expert economist, Dr. Merati, came up with $40,300
     for the G-12 profits after examining both Croton's invoices and ShopNBC's purchase orders.
28

## D.   DISMISSAL OF DEFENDANT'S PETITION TO CANCEL PLAINTIFFS' TRADEMARK

On August 6, 2007, Croton filed a Petition for Cancellation with the Trademark Trial and Appeal Board (TTAB).  The Petition alleged the following six claims against Plaintiffs: fraud in procuring the registration; fraud in filing the declaration of use; fraud in filing the declaration of incontestability; fraud in filing the renewal application; abandonment through naked licensing; and abandonment through non-use.

Section 37 of the Lanham Act, 15 U.S.C.A. § 1119, provides that in any action involving a registered mark, a court may determine the right to registration.  *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) (citing 15 U.S.C. § 1119).  "A registered trademark may be cancelled by direct attack as prescribed by the statute, and it may also be collaterally attacked in any action where the validity of the mark is properly in issue."  *Id.* (citing *Sylvania Elec. Prods. v. Dura Elec. Lamp Co.*, 247 F.2d 730, 732 (3rd Cir. 1957)).  "In other words, the statutory presumption of validity simply casts the burden of proof on the one who questions the validity of a registered trademark."  *Id.*  District courts are permitted to resolve these subsidiary registration disputes when joined with an infringement claim.  *See* 15 U.S.C. § 1119.

From the record before the Court, it is clear that Croton has not established any of the arguments raised in its Petition for Cancellation.  Thus, for many of the same reasons that the Court finds Croton liable for infringement, Croton's TTAB Petition for Cancellation must fail.  Accordingly, Croton's Petitions for Cancellation shall be dismissed with prejudice, because Croton has not produced evidence of fraud, abandonment, or naked licensing.

## E.   PLAINTIFF'S MOTIONS PURSUANT TO FRCP RULE 37(C)(2)

On the last day of trial, Plaintiffs moved for sanctions on the grounds that Defendant provided discovery responses in bad faith.  Defendant's opposition focuses primarily on technical or procedural flaws in Plaintiffs' motion.  To a lesser extent, and not as

1    passionately, Defendant argues that there has been a waiver and Plaintiffs are no longer able

2    to take exception to Defendant's failure to comply with its discovery obligations.  Less

3    forcefully still, Defendant takes the position that the requested information has indeed been

4    provided in both documents and by David Mermelstein during his deposition.  The Court

5    disagrees on all counts.  The following responses, by way of example, were offered:

6    Defendant Croton Watch Company, Inc.'s Replies to Plaintiff's First Set of Requests to

7    Admit:

8    1.    Admit you use the name "Bellagio" exactly as Plaintiffs have registered it with the

9          United States Patent Trademark Office.

10   RESPONSE:

11         Denied.

12   2.    Admit your use of the word "Bellagio" is identical to Bellagio.

13   RESPONSE:

14         Denied.  Defendant objects to the definition of the term Bellagio.[8]  Upon information

15         and belief, Plaintiffs' Bellagio trademark is invalid and subject to cancellation.

16   6.    Admit You knowingly used a false designation of origin to describe Your Bellagio

17         Watches.

18   RESPONSE:

19         Denied.  Defendant objects to the definition of the term Bellagio Watches. Defendant

20         never sold or distributed any watches bearing the trademark Bellagio.  Defendant

21         only sold the accused watches as Croton watches to ShopNBC.  Defendant has no

22         customers other than ShopNBC for the so-called "Bellagio" watches.  ShopNBC,

23         upon information and belief, in turn sold those accused watches to individual

24         consumers.  ShopNBC may have referred to the name "Bellagio" in advertising those

25   ─────────────────────

26         [8]  "Bellagio" is defined in the Requests to Admit to mean "that trademark registered with the
     United States Patent Trademark Office that was duly and legally issued as registration number 1,744,449
27   and serial number 74,264,561 on the United States Patent Trademark Office Principal Register, and
     renewed on or about 1999 and 2003.
28

Croton watches on television.  Consequently, any complaint by Plaintiffs should have been asserted against ShopNBC rather than Defendant.  Defendant successfully sold the identified Croton watches without any mention of the term Bellagio, to other customers such as Shop at Home.  As a result, any reference by ShopNBC to the name "Bellagio" in advertising the watches on television did not account for the sales of the Croton watches to consumers.

7.     Admit You described the Croton G12 watch to be related to the Bellagio watches.

RESPONSE:

Denied.  (Last in the series?)

8.     Admit You described Your goods using Plaintiffs' trademark.

RESPONSE:

Denied

9.     Admit You described Your watches using the name Bellagio.

RESPONSE:

Denied

13.    Admit that You knowingly used Plaintiffs' Bellagio trademark on Your watches, in promotional materials, product brochures, and/or advertisements for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services.

RESPONSE:

Denied.

Plaintiffs offered into evidence proof of registration of "Bellagio" for use in connection with watches and jewelry.  Defendant has no legitimate basis for its objection to Plaintiffs' definition of "Bellagio" as "that trademark registered with the United States Patent Trademark Office that was duly and legally issued as registration number 1,744,449 and serial number 74,264,561 on the United States Patent Trademark Office Principal

Register, and renewed on or about 1999 and 2003." There is no serious dispute but that Defendant used the word Bellagio in connection with its sale of its watches. Therefore, one wonders how requests 1, 6, 7, 8, 9 and 13 can, in good faith, be denied.

In the same vein and in response to Request number 6, which seeks an admission that Defendant used the word Bellagio to describe its watches, Defendant denies the request. Inexplicably, Defendant then states: "*ShopNBC* may have referred to the name 'Bellagio' in advertising those Croton watches on television. Consequently, any complaint by Plaintiffs should have been asserted against ShopNBC rather than Defendant." (Emphasis added). The Court had occasion to view recordings of several broadcasts of ShopNBC when Mr. David Mermelstein was on the air, loudly and repeatedly proclaiming "Bellagio" in connection with the promotion of his Croton watches. He did this repeatedly and on every single broadcast. Likewise, when the request seeks an admission that "you use[d] Bellagio to describe your goods," as in Request number 8, the request cannot in good faith be denied. As a another example, and the examples are many, the Court was shown a magazine advertisement (Exhibit 296) for the Croton Bellagio Generation XI depicting a couple seated at a gaming table.

<ol start="1">
<li>
<u>An Unreasonable and Bad Faith Denial May Subject the Responding<br>Party to Liability for Costs and Fees</u>
</li>
</ol>

Rule 37(c)(2) provides in part: "If a party fails to admit what is requested under Rule 36 and if the requesting party later proves . . . the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof." The Court finds that Defendant shall be liable for any excess costs associated with having to prove at trial matters about which there could be no reasonable dispute, occasioned by Defendant's bad faith discovery responses.

Plaintiffs make similar complaints about Defendant's answers to interrogatories. The Court's review of Defendant's answers to interrogatories confirms that Defendant, to the extent possible, sought to avoid providing any information or as little information as

1   possible.  During the hearing on Plaintiffs' request for sanctions, defense counsel was

2   specifically asked about Defendant's response to Interrogatory number 24 which asks:

3   "Please identify the total amounts you spent on the Bellagio Watches (i.e. total costs or

4   deductions claimed)."

5          In response, Defendant states: "Defendant objects to this interrogatory to the extent

6   that it is vague.  It is unclear what is meant by the term 'spent' in the context of this

7   interrogatory.  Furthermore, as stated in reply to Interrogatory number 1, Defendant has not

8   sold any watches under the name 'Bellagio.'"

9          Throughout the trial, defense counsel repeatedly touted his experience as an

10  intellectual property attorney.  Indeed, the firm's web-page proclaims his firm's specialty

11  as intellectual property law.  It is then reasonable to presume that counsel is well-versed on

12  the Lanham Act.  Counsel was specifically queried about his awareness of 15 U.S.C. §

13  1117(a), which provides that a plaintiff, upon establishing a wilful violation of the Act, shall

14  be entitled to recover a defendant's profits, damages sustained, and costs of the action.  "In

15  assessing profits the plaintiff shall be required to prove defendant's sales only; *defendant*

16  *must prove all elements of cost or deduction claimed*." 15 U.S.C. § 1117(a) (emphasis

17  added).  Within this context, when Defendant is specifically asked to identify "the total

18  amounts you spent on the Bellagio Watches (i.e. total costs or deductions claimed)," the

19  significance of the question is clear.

20         It is presumed that defense counsel knew that it would be required to establish at trial

21  any costs or deductions claimed as an offset to the revenues generated from the infringing

22  conduct.  The Court is then left to assume that Defendant willfully refused to share this

23  information with Plaintiffs prior to trial.

24         Defendant now argues that, while the interrogatory was not directly answered, the

25  information sought was produced in the form of documents and in the deposition of David

26  Mermelstein.  (*See* Opp. at p.13:1-7.)  A review of that deposition and the obstructionist

27  tactics employed by defense counsel merely serve to re-enforce the notion that Croton's

28

primary objective was to provide as little information as possible.  Rule 33(d) provides:

> If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by: (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and (2) giving the interrogating party a reasonable opportunity to examine and audit the records . . . .

First, the Court again notes that the burden is not on the Plaintiffs to demonstrate Defendant's expenses.  Plaintiffs are, however, entitled to learn what evidence of expenses Defendant intends to introduce at trial.  Therefore, a complete response to the interrogatory is required.[9]  Second, to the extent that defendant wishes to now contend that the documents produced satisfy the requirements of Rule 33(d), that argument fails.  In no way can the partial production of documents and deposition testimony of David Mermelstein, which indicated that the production was not a complete production of all documents evidencing the company's expenses satisfy the requirement that the production "specify [] the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could."

The obstructionist conduct of defense counsel throughout the deposition clearly manifest a deliberate effort to thwart Plaintiffs' legitimate discovery efforts.  For this willful failure to provide a meaningful response to the requests for deductible expenses and costs associated with the generation of revenues from the sale of the "Bellagio Generation" of watches, as a sanction, the Court precludes Defendant from introducing evidence of such costs and expenses.

Fortunately for Defendant, Plaintiffs' expert, Dr. Merati, examined Croton's invoices

---

[9]  The Court notes that during the deposition of David Mermelstein, when Plaintiffs' counsel was attempting to ascertain whether all of the documents relative to expenses incurred in generating revenues for the sales of the Bellagio series of watches had been produced, Plaintiffs' counsel asked defense counsel to produce any documents not already produced.  The response was "duly noted," which understandably inspired little confidence that Defendant would comply with the discovery obligation.

to its supplier which evidenced Croton's partial costs.  This information was introduced at trial through Plaintiffs, and Dr. Merati testified as to how the information was derived. Regardless of which party bore the burden of proof at trial, these expenses were in fact introduced at trial and have been considered as an offset to the gross revenues testified to by Dr. Merati.

### 2.    Court's Findings as to Defendant's Conduct

In the final analysis, it is the Court's view that the litigation conduct of Defendant and its counsel went beyond the bounds of providing a vigorous defense.  The Court finds that the conduct of Defendant and its counsel during the course of discovery falls within the definition of bad faith.  Indeed, much of Defendant's conduct during the course of this litigation appears designed primarily to make the litigation as costly to Plaintiffs as possible –to what end is not entirely clear.  Having destroyed the utility of the licensing agreement, and a major source of Plaintiffs' revenues, Plaintiffs were essentially ruined.  However, so as to extinguish any remaining signs of life, Croton then sought to invalidate Plaintiffs' trademark based on nothing more substantial than "information and belief."  The Court concludes that Defendant's "bad faith" conduct warranting discovery sanctions also makes this an "exceptional" case under 15 U.S.C. § 1117(a).  For these reasons, the Court orders Croton and its counsel to pay to Plaintiffs costs and fees incurred from August 10, 2007 (the initial date of Croton's bad-faith discovery responses) onward.

However, the evidence before the Court is insufficient to make a determination of the amount of cost and fees incurred from that date through the conclusion of the trial. Plaintiffs are therefore invited to provide an itemized Bill of Costs and Fees in a form substantially in conformity with Local Rule 54-3.  Said Bill of Costs and itemized billing records are to be electronically filed on or before September 2, 2008, for hearing on September 22, 2008 at 1:30 p.m.  Any opposition shall be filed in conformity with Local Rule 54-7.

IV.    CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs are entitled to judgment. The judgment of the Court will await the rule 54-3 submissions so that it may be a single all-inclusive judgment.  The Court finds Defendant liable to Plaintiffs for trademark infringement and false designation of origin under the Lanham Act and unfair competition under state and federal law.  Plaintiffs suffered actual damages under § 1117(a)(2) in the form of lost royalties in the amount of $238,833.  Plaintiffs are also entitled to recover $78,313 of Croton's profits pursuant to § 1117(a)(1) resulting from Defendant's willful infringement in connection with Croton's Bellagio 11 and G-12 watches.  Accordingly, Defendant will be ordered to pay Plaintiffs $317,146.  Plaintiffs are also entitled to costs and attorneys' fees in an amount yet to be determined.

IT IS FURTHER ORDERED that Defendant is permanently enjoined from the use of Plaintiffs' registered trademark "Bellagio" in connection with the marketing, promotion, distribution, advertising, offering for sale or sales of watches, without the express written permission of Plaintiffs.

IT IS SO ORDERED.

DATED:    August 19, 2008

_____

OTIS D. WRIGHT II
UNITED STATES DISTRICT JUDGE